UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                             Nos. 16-20008
                                             16-20466
                                             17-20200

v.                                     Hon. Matthew F. Leitman

JARED LOCKWOOD,

    Defendant.
_____/

## Government's Response to Defendant's Motion for Compassionate Release [R. 53]

Jared Lockwood's conduct before this Court is the picture of dangerous, self-interested, and unimproved decision making. After he was caught in early 2016 possessing and distributing numerous images and videos of horrific child pornography, he had a chance to accept responsibility for that crime and move on to a better life. Instead, he manufactured four pipe bombs in hopes that he could frame another person for possession of them to get a discount on his sentence. When he was caught doing that, he lied to the Court and committed perjury. Then,

1

after being sentenced for those crimes, he snuck a cell phone into prison, violating prison rules.

Lockwood began serving his current sentence on December 15, 2016. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and asks the Court to immediately release him to begin his term of supervised release. Lockwood Motion, ECF No. 53, PageID.686. His motion should be denied.

Lockwood does not qualify for compassionate release. For starters, because Lockwood has arguably not satisfied the mandatory exhaustion requirement in 18 U.S.C. § 3582(c)(1)(A), the Court is barred from addressing his argument on the merits. *United States v. Alam*, 960 F.3d 831 (6th Cir. 2020). Lockwood also does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Lockwood does not have a medical condition that places him at heightened risk from Covid-19. Indeed, Lockwood does

not even allege that he is at heightened risk from Covid-19, but rather argues that he is not otherwise receiving adequate medical care from the BOP. But the record indicates otherwise. Moreover, Lockwood's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he manufactured extremely dangerous devices in an attempt to get a reduced sentence, and lied to the Court about what he did. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because of the seriousness and repeated nature of his crimes.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Lockwood, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of September 15, 2020, this process has already resulted in at least 7,633 inmates being placed on home confinement. *See* [BOP Covid-19 Website](#).

At least 116 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Lockwood's motion for compassionate release.

## I. BACKGROUND

Between September 2014 and February 2015, defendant Jared Lockwood spent numerous hours viewing child pornography on an underground website, accessing threads with hundreds of sexually explicit pictures of seven to fourteen year-old girls. No. 16-20008, PSR ¶ 11. As a result of his online activity, the FBI executed a search warrant at Lockwood's apartment in July 2015. *Id.* ¶ 12. Agents seized several of Lockwood's electronic devices, and discovered numerous child pornography images and videos on them. *Id.* ¶ 15. Many files were advertised based on the age of the victim, such as "5yo," "7yo," and "9yo." *See generally* Sentencing Memorandum, ECF No. 40, PageID.312–16. Others were advertised based on the sexual acts depicted, using explicit terms to indicate that they contained videos of little girls being anally

raped. *Id.* Lockwood was charged and pleaded guilty to possession of child pornography in March 2016. ECF No. 19.

Then, in April 2016, the Government received information that Lockwood wanted to tell authorities about several pipe bombs. No. 16-20466, PSR ¶ 8. The government referred Lockwood to the FBI, and Lockwood told agents that he knew about the manufacture of some pipe bombs, that there was no imminent threat, and that the attack would occur sometime between five days and two weeks from the date of the conversation. *Id.* Agents had follow-up in-person meetings with Lockwood, who provided names, addresses, and criminal histories of individuals he claimed were making the bombs. *Id.* ¶ 9. The FBI continued the investigation, interviewing others based on Lockwood's statements. *Id.* ¶ 10.

While that investigation continued, two of Lockwood's friends reported that he had a plan to plant pipe bombs at the home of a person he knew was a convicted felon. *Id.* ¶ 11. Lockwood told one friend that he was going to do this to "get points off of his sentence," told another that he was going to make this friend who was a felon "look like a terrorist," and told yet another that he needed to "get the attention of the FBI." *Id.*

Lockwood threatened at least one of these friends, telling them that if they went to the police, they would be killed. *Id.* According to his friends, if planting the pipe bombs did not result in an adequate reduction in Lockwood's sentence, Lockwood had told them that he would fake his own death and camp out in the woods to evade law enforcement. *Id.* His friends also said that he used one of his friends' computers to access Amazon and put over $500 dollars' worth of camping equipment in his Amazon cart. *Id.*

Based on the information, the FBI believed that Lockwood had lied to them, and the government requested an emergency hearing to revoke his bond. At the hearing, Lockwood testified that he had never possessed PVC pipe (used to make the bombs), that neither he nor his wife had possessed pipe bomb components, such as a fuse or black powder within the past 60 days, that he had only a "couple" of camping items in his Amazon wish list, and that he had never shown his friend his Amazon account. *See* May 10, 2016 Tr., No. 16-20008, ECF No. 31, PageID.193–97.

The Court ordered Lockwood temporarily detained, continuing the detention hearing to May 12. *See id.* at PageID.206. The FBI continued

to look for the pipe bombs. Sentencing Memorandum, ECF No. 13, PageID.64. They discovered—at the residence of one of Lockwood's friends—Lockwood's Amazon account still open on the computer, with over $500 dollars' worth of camping equipment in the cart, contrary to his testimony in court. *Id.* Then, the FBI identified that another of Lockwood's friends had allowed Lockwood to use his garage. When the friend allowed the FBI to search it, they found four pipe bombs (three of which were operable) in the garage, containing screwdriver bits and other shrapnel. *Id.* at PageID.65–66. The FBI continued to investigate, and recovered video of Lockwood purchasing parts for the bombs at Home Depot, and also identifying that Lockwood falsified various receipts and paperwork to hide his plans. *Id.* at PageID.66–67.

Lockwood was indicted in June 2016 on counts of manufacturing unregistered devices and making false statements to the FBI and to the Court. No. 16-20466, ECF No. 1, PageID.1–7. Lockwood pleaded guilty in August to one count of manufacturing an unregistered device and one count of making a false statement before the Court. ECF No. 12. The Court sentenced Lockwood on all of his charges in December 2016, ordering that Lockwood serve 60 months on the false statement charges,

and 108 months on the child pornography charges, to be served concurrently to each other. The Court also ordered that Lockwood serve 120 months' on the bomb/making charges, 30 of which were to be served consecutive to the child pornography charges, resulting in a total of 138 months' incarceration. No. 16-20466, ECF No. 16, PageID 193.

Lockwood was initially housed at the Milan Federal Detention Center. In December—the same month he was sentenced on the other cases—Lockwood was caught with a cellular phone in his cell. Lockwood admitted the phone was his and claimed that he had gotten in from another inmate, who Lockwood said had threatened to tell other inmates that Lockwood was incarcerated for child pornography offenses unless Lockwood smuggled in several phones. That inmate, however, said that he gave Lockwood the phone in exchange for Lockwood charging several other phones for him. *See generally* No. 17-cr-20200, Sentencing Memorandum, ECF No. 26, PageID.107–09. The Court ultimately sentenced Lockwood to 4 months' incarceration—consecutive to his other sentences—for the offense. ECF No. 29.

Lockwood is currently incarcerated at McKean FCI. He is 27 years old, and his projected release date is April 6, 2026. Lockwood does not

have any health conditions that would place him at increased risk from Covid-19 complications. Ex. 1, Lockwood Medical Records. Lockwood is, however, suffering from gallbladder pain for which he has sought treatment through the BOP. *Id.* at 55; *see also* Lockwood Motion, ECF No. 53, PageID.682–83. He visited BOP doctors for his pain on June 30, 2020, and again on August 10, 2020. Ex. 1, Lockwood Medical Records, at 55–61. During his August visit, his doctor identified potential gallbladder complications, and referred him to a surgeon who will treat him onsite, with a scheduled target treatment date of September 30, 2020. *Id.* at 55. The government contacted the BOP for additional information about that follow-up care, and the BOP advised the government that the surgeon will conduct an ultrasound and determine if further outpatient surgery is necessary.

Nevertheless, Lockwood has moved for compassionate release, citing his abdominal pain and his behavior while incarcerated. Lockwood has not, however, moved for a reduction in sentence through the BOP administrative process. Instead, his wife has asked the BOP that he be permitted to serve the remainder of his sentence on home confinement rather than in a BOP facility. Lockwood Motion, ECF No. 53,

PageID.690–92. Contrary to what Lockwood states in his motion, the BOP responded to that motion on July 7, making clear that the BOP interpreted it as a request for home confinement—not a request for compassionate release—and denied the request. Ex. 2, BOP Response to Request for Home Confinement.

## II. ARGUMENT

### A. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### 1. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the BOP has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the BOP began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the BOP started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the

BOP has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the BOP has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the BOP has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the BOP has increased inmates' telephone allowance to

500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the BOP has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the BOP's measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### 2. The BOP is increasing the number of inmates who are granted home confinement.

The BOP has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the BOP to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the BOP to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the BOP

to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The BOP's efforts on this point are not hypothetical. Over 7,633 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the BOP is basing its home-confinement decisions on several factors:

1. Each inmate's age and vulnerability to Covid-19;

2. Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3. Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal

activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The BOP, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The BOP must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would

be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the BOP's home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the BOP must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the BOP to make them and has not subjected the decisions to judicial review.

18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the BOP's substantial and ongoing efforts to address the Covid-19 pandemic.

## B. The Court should deny Lockwood's motion for compassionate release.

Lockwood's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the BOP or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### 1. Lockwood at least arguably has not satisfied the statutory exhaustion requirement.

Though Lockwood's wife requested that he be placed on home confinement for the remainder of his sentence based on the concerns that he raises here, Lockwood never specifically asked for any reduction in sentence under 18 U.S.C. § 3582(c)(1)(A). At least arguably, then, the Court must dismiss Lockwood's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the BOP could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). As the Sixth Circuit recently held in *Alam*, this statutory exhaustion requirement is "a mandatory condition" that "must be enforced" when the government raises it. *Id.* at 832–36; *accord United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020).

Lockwood at least arguably did not comply with § 3582(c)(1)(A)'s mandatory exhaustion requirement. He does not argue that he ever filed a motion seeking a reduction in sentence from the BOP. Instead, he argued that his wife filed a request seeking to allow him to serve the remainder of his sentence under home confinement. Lockwood Motion, ECF No. 53, PageID.690. But as the Sixth Circuit recently explained, where an inmate makes an "administrative request for home

confinement" but makes "no mention of compassionate release," the inmate seeks "a different form of relief—a transfer in custody under § 3624(c)(2) and the CARES Act—with different eligibility requirements," and that request does not satisfy the exhaustion requirement under § 3582(c)(1)(A). *United States v. Desjardins-Racine*, 817 F. App'x 219, 221 (6th Cir. 2020). That is the circumstance here—the request that Lockwood's wife made on his behalf never sought compassionate release, but rather a transfer to home custody. Lockwood's motion for compassionate release should therefore be dismissed for failure to exhaust. *Alam*, 960 F.3d at 836.

### 2. Lockwood is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even if Lockwood exhausted his administrative remedies, compassionate release is improper. Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence reduction only

when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the BOP has set forth in [Program Statement 5050.50](). USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The BOP has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Lockwood and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and

professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Lockwood's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Lockwood is only 27 years old, and his medical records establish that he does not have any health condition that is known to place him at a higher risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19). So whether considered alone or in combination with the Covid-19 pandemic, Lockwood's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

Indeed, Lockwood does not appear to argue that his age or health conditions place him at increased risk of complications from any potential Covid-19 infection. Indeed, his motion does not mention Covid-19 anywhere in its text. *See generally* Lockwood Motion, ECF No. 53. Instead, he argues that his gallbladder pain is not being adequately

treated by the BOP. *Id.* at PageID.683. But this is contradicted by his health records, which indicate that he saw his regular doctor about the issue in early August, and is scheduled to receive care from a specialist this month. Ex. 1, Lockwood Medical Records, at 55–61. There is nothing in the record indicating that the BOP has not provided him adequate care, nor is there any indication that Covid-19 has any impact on his ability to receive care.

Lockwood also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under

USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even

without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at \*3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at \*3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect.

Because Lockwood's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). One of Lockwood's offenses involved manufacturing operable pipe bombs containing screwdriver bits and other shrapnel—an incredibly dangerous course of conduct. Lockwood was willing to make these bombs in hopes of duping the FBI and the government into giving him a reduction in his sentence for revealing their location. Flatly, Lockwood was willing to risk the safety of everyone around those bombs for his own benefit. Moreover, his child pornography offense disregarded the safety of children who were exploited to make the pornography he consumed.

Lockwood is not eligible for compassionate release.

### 3. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Lockwood eligible for compassionate release, the § 3553(a) factors should still disqualify him.

First, regarding Lockwood's bomb-manufacturing: Lockwood spent months manufacturing four pipe bombs, three of which were operable and capable of causing death or serious injury. He stored his pipe bombs a friend's home. That person and his 81-year old mother had no idea that there were deadly weapons in their garage. If one of the fuses on those bombs became ignited, they could have been killed. Moreover, Lockwood manufactured the bombs in order to frame his friend so that Lockwood could get a reduction on his child pornography sentence. And his plan was sophisticated. He targeted a friend he knew had an extensive criminal history, knowing the FBI would be more likely to believe him. He forged signatures on documents so that he could have time to create the bombs. He used a stolen Home Depot credit card to purchase the PVC pipes and end caps. He contacted the FBI well before sentencing so he could receive the reduction.

And, of course, Lockwood's perjury offense was also egregious. First, Lockwood knew that the FBI was trying to find the pipe bombs and make them safe and that law enforcement considered this an emergency situation. Yet, Lockwood testified that he had not possessed any PVC pipe. Second, it is a rare thing that a District Court judge will question a

defendant and rarer still that the Court will specifically warn him that he is under oath and give him the opportunity to change his testimony. Despite the Court's warning, Lockwood did not modify any of his testimony. Lockwood blatantly lied in the most direct way possible to the Court multiple times.

Lockwood's underlying child pornography offense was extremely serious as well—more serious than the average possession-of-child-pornography because Lockwood not only possessed child pornography, he also distributed it by using peer-to-peer software. Moreover, his collection was horrific. It mostly consisted of lengthy videos as opposed to images or short clips. These videos depicted little children suffering pain and humiliation. Even worse, Lockwood appeared to have a predilection for watching family members engaged in sexual activity with one another. More specifically, he collected video after video with fathers raping their small daughters, with mothers helping fathers rape their little girls, and with siblings engaged in sexual acts with one another.

Last, even after committing new offenses following his child pornography charge and being caught, Lockwood continued to offend by possessing a cell phone in prison after his sentencing. While that offense

in and of itself is not especially serious, it demonstrates a pattern of behavior that is disturbing. In short, Lockwood's conduct does not suggest he is a good candidate for compassionate release.

### C. If the Court were to grant Lockwood's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Lockwood's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## III. CONCLUSION

Lockwood's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/John B. Meixner Jr.*
John B. Meixner Jr.
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226
(313) 226-9626
john.meixner@usdoj.gov

Dated: September 16, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2020, I electronically filed the foregoing document with the Clerk of the Court of the Eastern District of Michigan using the ECF system, which will send notification of such filing to all counsel of record via electronic mail.

*s/John B. Meixner Jr.*
John B. Meixner Jr.
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226
(313) 226-9626
john.meixner@usdoj.gov